Madam Clerk, please call the first case. 12-2975-2014-15-39 Jacobs Szafranski v. Dunston Thank you. Will counsel who would be presenting please step forward. Counsel for the Plaintiff Appellant. Good afternoon, Your Honor. It's Brian Schroeder of the law firm Schiller DeCanto Inflect for Plaintiff Appellant Jacob Szafranski. And for the appellee. Good afternoon, Your Honor. Sarah Fletcher of the law firm of K&L Gates. Very well. 15 minutes for each side. There will be a brief rebuttal for the Plaintiff Appellate. Thank you, Your Honor. Thank you. Please commence. Thank you. Your Honors, we're here to determine, as this Court set forth in Szafranski 1, whether a contract existed between the parties and to enforce that contract. As we've set forth in our briefs, there is in fact such a contract. It is the informed consent form the parties signed on March 25, 2010. I'm going to stop you for a minute, Counsel. In your briefs, you refer to an oral contract of March 24th. Yes. What is your position on the March 24th communication? The March 24th communication was a telephone call that Dr. Dunson placed to Jacob, wherein she explained to him that she had been diagnosed with cancer. Counsel, I'm not trying to interrupt you. I just want to get to the point. You vindicated in your brief, you referred to that as the March 24th oral contract. What I want to know is, is it your position that there was an oral agreement made on March 24th? Yes. The oral agreement was to create the pre-embryos. Nothing more, nothing less. On that point, Justice Lew, the parties both testified that in that conversation on March 24th, the topic of consent to the use of the embryos in the future was something that was not discussed at all. On March 25, the next day, the parties went to the fertility clinic, met with Dr. Ralph Kazer, among others, to begin the process of creating the embryos. In that meeting, Dr. Kazer presented them with the contract. An informed consent form is its title, and one of the provisions of that document says, no use can be made of the embryos without the consent of both partners. And Dr. Kazer testified that he specifically discussed that provision with Jacob and Carla. You're talking about the Northwestern Hospital's informed consent. Yes, Your Honor. But where in there is there anything that involves the two of them in an agreement? The plaintiff and the defendant. The agreement was between the three of them, between Jacob, Carla, and Northwestern, was that Northwestern would – let me back up. Carla would provide eggs. Jacob would provide sperm. Northwestern would combine them into embryos and freeze them for potential future use. And that was done pursuant to the oral contract that was entered into, so there was performance on that contract. And that's what the circuit court found, that the providing of sperm and egg on the 25th, I'm sorry, on April 6th, was performance of the oral contract of the 24th, which was limited in scope to the creation of the pre-embryos. But there's no advance directive at all, so there's nothing between the two parties. Northwestern – this was for Northwestern's purpose. That's what Dr. Dunstan's going to argue, but this is not simply for Northwestern's purpose, because, again, Jacob and Carla signed it. They – Carla testified that by signing it, she agreed to its terms. The only thing that I saw written on that, and correct me if I'm wrong, was that they each initialed that they would permit a third party to receive – In the event I think it was that one of them died, the embryos would be donated to another company. In the event of the death of one, it would go. Yes. Yes. But that doesn't mean that that's the only extent of their agreement, because Dr. Kazer testified that he explained the provision to them, which is on that same page of the informed consent, that says no use can be made of the embryos without their mutual consent. So the consent agreement says embryos are understood to be your property with rights of survivorship. No use can be made of the embryos without consent of both parties. And it says – And they signed off on this? Yes. They both – their signature is at the end of the document. Counsel, I just want to ask you, doesn't it – I want to put this into context. The disposition of the embryo section is contained on pages 11 and 12 of a 21-page document, correct? Yes. And it falls under the subsection A2C, which is titled technique of IVF. It goes on to describe the disposition of embryos, which is separate from section F, legal considerations and legal counsel, which doesn't refer to anything regarding cryopreservation. Is that correct? The section F? No, that talks about the law being unsettled in this area. So under section A, isn't the placement of the language embryos are understood to be your property with rights of survivorship also under that subpart immediately afterward? Subpart A says, quote, in the event of divorce or dissolution of the marriage or partnership, NMFF, referring to Northwestern, will abide by the terms of the court decree or settlement agreement regarding the ownership and or other rights to the embryos. Isn't that what the section is referring to? We will defer to what agreement you have in place. That's talking about an agreement that the parties may reach in the future, not one they may have walking in the door, which they did not have. I asked you the question previously, was there an oral agreement that was in place as of March 24th? To create them. And was there a limitation placed on that March 24th agreement at the time it was made? No, this was an agreement that was done in a several-minute phone call between the parties where Jacob testified he was at work and actually on a cell phone in the bathroom. Let me ask you something. I understand the rapidity and the fact that everything has moved quickly, but we're talking about also a situation in which within 24 hours there's been performance on the contract, correct? The first sperm deposit was March 25th, approximately 24 hours after the contract was first made. Right, the phone call, yes. Well, again, was there a limitation expressed? No. But was there a limitation contemplated? No. They didn't consider the issue of how and when would we use them in the future. The focus was we should create them now because I have to undergo chemotherapy. Then how can we read or interpret or construe an intent by Mr. Safranski to reserve the right to object or withhold consent? How can we construe that into the agreement if it wasn't contemplated? You, in your brief, have indicated that secret intent or unmanifested intent, unexpressed intent cannot be the basis for reaching mutual assent necessary to modify, to limit, or to interpret an agreement. How do we get to that part if it's never been expressed? Because the next day they signed a form that said you both must consent. The agreement of March 25th contained something that the agreement of March 24th did not address, did not consider. That's how you get there. And so you're saying that this is the one occasion when the intent and the agreement by both parties to give Mr. Safranski a veto power, essentially, over all of the remaining frozen embryos that are left following this procedure, this is where the parties have manifested their agreement in the document and that's it? Yes. Right. They had no other, again, the discussion of March 24th didn't address that issue. In the record, was there evidence that the parties discussed, talked about, or mentioned anything about the disposition and veto of the use by Dr. Dunstan in the event they separated or terminated? Yes. That evidence is Dr. Kayser's testimony that he went over that with them. And Jacob's testimony that Dr. Kayser related that to them during the meeting with him on March 25th. That's a pronouncement by Dr. Kayser, right? That's his testimony. Didn't he tell them to go get legal counsel? He said, you don't know what can happen in the future. You may separate. Who knows what the future holds? So, yes, go talk to a lawyer. But for right now, we're going to agree that you both have to consent. If you want to go out and do whatever you want to do after that and make a new agreement, we'll follow whatever you want to do. But right now, we're going to sign this, which says you both must consent. Neither of them objected. Carla testified she never asked to modify that portion or any portion of the consent document. What if in your scenario there had been a situation where the parties had already met with Ms. Desai before coming in? Let's say, hypothetically, they met with Ms. Desai the morning of March 25th instead of the afternoon. And they had already signed an agreement in which the provision was in the event of termination or separation of the partnership, Mr. Zafransky has the sole custody or, you know, has the right. Let's say it doesn't matter. We'll stick with Dr. Dunstan. Dr. Dunstan has the sole custody. Let's say they entered into a contract in which she was given sole custody and the right to use the two of our preserved embryos without limitation. And they still signed the informed consent because, as Dr. Taser testified, it can't be changed. It can't be modified. Then what does that do? Are you saying the informed consent then changes or modifies the agreement that the parties would have entered into in writing? My first answer is, respectfully, it's immaterial that Dr. Taser said he would not change it because he was not asked. He offered that testimony that he would not change it in February of 2014 at his deposition. When the document was signed in March of 2010, again, no one asked to change it. And to say that something you learned four years later gives you the right to argue something that you didn't know and didn't express at the time, I think, is not proper. The informed consent document, I'm sorry, the draft co-parent agreement that needed to be prepared has a provision that says this agreement prevails over everything else. Any other understandings you may have. Then, now, under your hypothetical, we'd have a conflict, of course, between this contract you've suggested and the informed consent. What I would expect is if they, in fact, had met need to decide on March 24th and entered a contract under the terms you've set forth, that on March 25th, the very next day, when they're speaking with Dr. Taser and he says, oh, by the way, here's this form. You both must consent. I would have expected one or both of them to say, hey, wait a minute. We already signed something that says this. And now you're asking us to sign something that's directly contradictory. That's what I've expected to have happened. And the fact that it didn't means, again, that they agreed with his position that you both must consent. And he said, go work something out later. But that later never happened. So the parties have to live with the contract that they made. May I ask, you're here because the circuit court determined that on March 24th, the parties mutually agreed that Carla would have the sole control over the embryos. What evidence, if any, was presented to the circuit court upon which they could base that question of fact? We submit none. Because, again, Carla and Jacob both testified the issue of disposition and control of the future use of the embryos was something they never discussed on March 24th. What Judge Hall said was they both harbored doubts about their relationship, but they never told each other that. And that was one factor for her ruling. As Justice Luke pointed out, as I cited in our briefs, unexpressed intent does not matter. It is the objective manifestation of intent that controls. So our view was the contract of the 24th cannot be construed to include a term the parties freely admit they never discussed. They never discussed it. Correct. So, therefore, the circuit court's conclusion is what? Against the manifest weight of the evidence? Yes, it is. Because I do not see how the circuit court could have found, as the court did, and expressed agreement that Carla could use the embryos without needing Jacob's consent in the face of testimony that that was an issue they never discussed. Another basis for her ruling was statements Jacob made in an email in September of 2010. But nothing in that email, and I dare say nothing else in the record, indicates that on March 24th, Jacob intended for her, for Carla, to not need his consent. And under the case law, you would construe a contract based upon the intent of the parties at the time the contract is made. So nothing that happened afterwards, after March 24th, can be relied upon to say what the parties intended on March 24th. Again, there's no evidence in the record where Jacob says, well, you know, on, say, December 1st, he sent an email saying, well, on March 24th, I meant this. There isn't anything like that. There's just a statement of September 10th, or September 2010, after the fact, which cannot be applied retroactively to impute intent to a prior event. And I think the third one was that the other basis for the Circuit Court's ruling was that Jacob did not place any limitations or conditions on Carla's ability to use the embryos. And as I've discussed, that's simply something they never discussed. It never crossed their minds. I mean, it was not even contemplated. So again, we come back to the point of how can the Circuit Court have discerned an intent in the face of we didn't ever talk about it, and then events after the fact, under the law, cannot be relied upon to retroactively impute an intent. All right. But Jacob himself, he had sent a message. He sent a number of messages to Carla that were extremely helpful to her in telling her that he did desire to see her conceive a child and have a child. Yes. Yes. And he never retreated from that. As a matter of fact, was there any discussion between them? He sent a message saying that he was indecisive about the intention of raising a child, that he was uncomfortable with it, but that it was ultimately her decision. That was something he sent in an e-mail, and as he testified by that comment, he did not mean that she would have the right to act as she pleased with the pre-embryos. He meant that it was up to her where to go next, whether we go to litigation and try and sort that out, or they keep talking, trying to work something out. But he did ask her explicitly if she would have some consideration of his feelings about this. He did, yes. I mean, I'm not going to hide from the fact that those e-mails are there, and I'm not going to hide from what they say. What I will say, though, is none of those documents or e-mails are being relied upon as being the basis of a contract whereby Carla can use the embryos without his consent. What happened after those e-mails were sent was various exchanges between the parties and Carla's then and still attorneys and Jacob's then attorney about settlement agreements, none of which came to fruition, and which Carla testified she didn't agree to any of them anyway. So while there are some, so to speak, damning statements by Jacob in those e-mails, as this Court said in the first Safranski appeal, we need agreements and not just statements of intent or feelings.  That's not an agreement. Mr. Schrader? If we decide for you, what happens with these embryos? The embryos will stay where they are. Will they stay until the parties reach an agreement? Yes. Jacob is not asking that they be destroyed. He does not want them destroyed. He simply wants his right to be respected to give consent to their use, and he may consent in a day, a month, a year. He may never consent, but we don't know what the future holds. But the short answer is if he prevails, they will stay where they are until such time as he and Carla agree on what to do with them. In the absence of an advance directive under Safranski 1, we would be using a balancing approach for this. Who should get the embryos? That is addressed partly in the briefs that we filed under seal. We submit that under a balancing of interests, Jacob still has the right to decide when and how they can be used, principally because, as the record reflects, Carla is the mother of a non-biological child. She testified as to how that has changed her perceptions of the case and the allegations she's made. And in short, she's become a mother without forcing Jacob to become a father. And that's really what a balancing of interests is all about. She's largely obtained many of the things she had alleged she wanted when she  Jacob has also testified that it has cost him relationships with others and it probably will in the future. And it colors how he views himself and the world. That's Jacob's lament. I can't find love. Well, respectfully, that's not a trifle. That is something significant. Mr. Schroeder. It is balancing. It went back to the circuit court to decide it on the contractual basis. And that's what the circuit court did. And that's what's before us now. Yes. Judge Howard did, the last page of her ruling, did undertake a balancing of interests, I think, for her to be thorough, I suppose. But, yes, we're not here to talk about a balancing. She addressed it, but we're here to talk about a contractual analysis, yes. Mr. Schroeder, there were two, let's say for lack of a better term, two sperm deposit events, correct? One was March 25th and the second one was on the day of the retrieval as well. That was April 6th, I think. Yes. So if we were to construe the informed consent document, the 22-page document as a binding contract for all three parties, there is a provision under page 7 that talks about how many eggs, you know, should be frozen, how many eggs should be fertilized. And there's a reference that you noted in your briefs that the parties had decided at that point to split the eggs. Half of them would be fertilized and half of them would be frozen. And on April 6th this did not occur, correct? Correct. And the record shows that because of the number of eggs that were retrieved, Dr. Kazer recommended that all of them be fertilized. Yes. Okay. At that point, do you think that under your scenario, if the informed consent regarding disposition of the embryos was reached by agreement of the parties on March 25th, does that change on April 6th on this second event when the circumstances have changed and this notation from March 25th no longer has any applicability either? So what does that do to the informed consent? It's changed the circumstances, hasn't it? I would submit it has not because the parties, you know, there was no guarantee about how many eggs would have been harvested. And that is expressed in the consent form itself, the possibility that not as many as expected would be harvested. And the document was, in fact, signed still with the provision that no use can be made of the embryos without the consent of both parties. So regardless of how many eggs were frozen versus how many embryos were frozen, Dr. Dunstan knew that no matter what, whatever embryos were created and frozen, Jacob would have the right to decide how they would be used. So I don't think it changes anything. So on April 6th, the veto power, which then gains, I guess, in its significance, she agrees to also? Yes. Okay. All right. Thank you very much. You'll have some time for rebuttal. Thank you, Your Honor. Thank you. Ms. Fletcher? Your Honors, you are being asked to decide whether Dr. Carla Dunstan can pursue her only option for having biological children. The pre-embryos at the heart of this case were very intentionally created by the parties so that Carla could use them to attempt to have a child if she survived cancer. To that end, Jacob repeatedly and consistently told Carla that he wanted to help her not simply create pre-embryos, but have a child, and knowingly agreed to fertilize with his sperm the final eight eggs that Carla would ever create. Holding Jacob to his promise to help Carla have a child is not only well-founded in contract, but is also the most equitable result. Your Honors, I'd like to first address the oral contract theory. Judge Hall correctly concluded that the parties reached an oral contract, pursuant to which Carla need not obtain Jacob's contemporaneous consent to use the pre-embryos. Counsel, on that note, I'd like you to identify me where in the record or in the deposition testimony or any documents there is evidence that the parties mutually consented to Carla having the sole exclusive control over the use or the non-use or the destruction of these embryos. Your Honor. Where is it expressly stated in the record? What the record demonstrates is that Jacob repeatedly promised to help Carla have a child. He first said that. Now, do you admit there is nothing expressly in the record that bestows upon her that exclusive right? Well, Justice, the record indicates that on March 25th, Nitty Desai, a neutral third-party witness, testified that Jacob specifically told her in the event that the parties were to separate, Carla should control, March 25th, that in the event the parties were to separate, Carla should control the disposition of the pre-embryos. Jacob, again, on March 24th, first told Carla he agreed to provide a sperm, knowing the background that Carla had been diagnosed with cancer. She had to undergo chemotherapy. The circuit court found that it was the March 24th oral phone conversation that gave her the rights to have exclusive control. But in the depositions and verified by the doctor, it appears that they never really expressly had that conversation. What the conversation was was that Carla could use the pre-embryos to attempt to have a child. Jacob specifically told you, I want to help you have a child. There were no other contingencies or limitations imposed on that. But does that imply mutual consent to have the exclusive control in one person? Isn't that a bit of a stretch? It's true that the specific word, consent, was never used. But the intention of the parties was always that Carla could use them in any circumstance to attempt to have a child with the return of her health. Now, Judge Hall didn't simply look at the March 24th agreement. She determined that she could consider contemporaneous or subsequent acts in order to determine the intent of the parties as of March 24th. When we look to the full course of conduct between March 24th through Jacob's June 14th email. And then the following day, after this alleged mutual agreement was made, the following day she signs off on an express contract written, unambiguous, provided by Northwestern Hospital. That's correct. So it seems logical that if the day before that they had agreed she was going to have exclusive control, it seems logical that the next day, presented with a written agreement, they would have said, hey, wait, we've already agreed. She's got exclusive control. Let's scratch that out and let's initial it. Why didn't that happen? Well, there's two reasons, Your Honor. First of all, the consent provision in the informed consent does not say anything about the separation of the parties. Dr. Kazer testified the informed consent does not document the parties' wishes with respect to disposition of the pre-embryos. Instead, he strongly encouraged unmarried couples to see an attorney to document their wishes. I'll read you a quote from page 451 of the record that I think is telling from Dr. Kazer. Quote, we don't feel that it would be appropriate to go to that individual level of detail in a standard consent form. Every couple is likely to handle this in a different way, and we feel that it's more appropriate for them to get legal counsel to document their specific desires about disposition and, in particular, if they ultimately split up. Jacob likewise admits the parties were never asked to agree on what should happen to the pre-embryos in the event of their separation on March 25th, but instead testified. Dr. Kazer encouraged them to see an attorney to resolve that issue, and we're told that Northwestern would abide by that agreement. The parties followed that advice. They had already reached the oral agreement the day before, pursuant to which Carla could use the pre-embryos to attempt to have children, and just hours later they met with their co-counsel, Nidhi Desai, to document their wishes. The statements that were made to Ms. Desai and that ultimately ended up in that draft co-parent agreement are all consistent with the oral agreement, pursuant to which- They never even looked at it. The co-parent agreement? Right. Jacob testified, in fact, that he did read the co-parent agreement on March 29th, never told Carla or Ms. Desai that he disagreed with any of his terms, and went on more than a week later, on April 6th, not only to provide his sperm, but to knowingly fertilize the final eight eggs that Carla Dunson would ever produce. Knowing full well that he did that, she wouldn't have the chance to go back and use another donor, and these would be her only opportunity to ever have a biological child. The agreement was never signed. She's had a child. She has had a non-biological child. That's correct. She has a child. They never signed the agreement, the co-parenting agreement. It's correct that they never signed the co-parenting agreement. Let me ask you about these two statements in this testimony by Jacob. Jacob testifies that placing limitations on Carla's use of pre-embryos never crossed his mind, and then he says after that that he never agreed that Carla could use the pre-embryos without first obtaining his consent. How do you reconcile those? I'm sorry. Can I hear those one more time? Okay. Jacob testified that placing limitations on Carla's use of pre-embryos had never crossed his mind. He further said that the parties never agreed that Carla could use the pre-embryos without first obtaining his consent. Well, I think the parties all agree that the specific word, consent, was never used, but they also agree that Jacob repeatedly told both Carla and third parties that he was doing this for the sole purpose of helping Carla have a child with a turnover health, not simply to create pre-embryos that they could talk about later whether or not they could use them. They knew this was Carla's last chance to have biological children. That is the deliberate reason for which these pre-embryos were created, and Jacob knew that going into it, and knowing all that, and also knowing, as Judge Hall found, that he didn't see a romantic future with Carla. Knowing all that, he did not condition her use of the pre-embryos on his contemporaneous consent, on the continuation of the romantic relationship between the parties. He didn't impose any sort of limitations. He simply said, I want to help you have a child. June 14th, which Judge Hall pointed to as the most persuasive evidence of Jacob's intent regarding future disposition of the pre-embryos, Jacob wrote two key things in that email. Number one, quote, I rather desire you to have a child of your own in the future with the return of your health, not for us to have a child when that time came. And number two, quote, I know that I must make a choice in this  And with respect to that second statement, Judge Hall made a specific factual finding that what Jacob meant is he was leaving it up to Carla to decide how to use the pre-embryos. She did not find credible Jacob's statement that he was leaving it up to Carla to decide whether to proceed with the lawsuit or not. Isn't that, again, isn't that email after the fact? It is after the fact, Your Honor, but the case law says that in determining meaning of the minds when a contract is silent, you can look to contemporaneous or subsequent acts or words. So this, although it occurred subsequent to the oral agreement, shed light on Jacob's intent at the time he entered into that agreement on March 24th. But let's, based on the evidence in the record as well as Ms. Harris' testimony, I mean, let's clarify one thing. It appears that many of the communications were written for a third party as well, for Ms. Harris. Is that correct? Ms. Harris? Ashley Harris? Oh, I see, yes, okay. Correct? It seems like she was interested in what was being communicated to Carla, and she testified that that last line was written as a polite gesture, right?  Is that what she said in her testimony? I believe you're correct. Why would that have a retroactive effect on what the party's intention was? Well, I certainly don't believe that Jacob ever testified that Ms. Harris had any sort of influence on the words that he was using. He also testified that when he wrote the June 14th, 2010 email, everything in it was true. He specifically testified at trial that the statements in that email were true. So I think we have to take him at his word on that. Moving on to the informed consent, which we briefly talked about, in Sapransky 1, this court ruled that the best way to resolve disputes over disposition of pre-embryos is to honor the party's mutually expressed intent. The informed consent simply doesn't do this. To put it in context, it's a standard consent form drafted by Northwestern, not for Jacob and Carla, but for every couple that's considering undergoing IVF. It's undisputed that the consent form Jacob seeks to enforce was a take-it-or-leave-it provision. It was unmodifiable, even if the parties had reached a previous agreement as to disposition. And a plain reading of the term reveals it did not address separation of the parties under the present circumstance or provide the parties with any sort of dispositional choice. This makes it different from any of the pre-embryo cases that have enforced an informed consent. We're not aware of any cases in which an informed consent that left the parties with no dispositional choice and did not contemplate the specific circumstance that the parties were in was enforced. To the contrary, courts have gone two different ways with these provisions. Certain courts have concluded that informed consent simply should not be considered dispositional agreements between sperm and egg donors. That's the AZ versus BZ case out of Massachusetts. Courts that have enforced informed consent as dispositional agreements have done so only where the forms expressly, clearly communicate disposition under the particular circumstances. So, for example, divorce and allow the parties to select from various dispositional options. For example, donate to female partner, donate to male partner, donate to another couple, donate to research. This consent provision does not do either of those things. Counsel, have there been any informed consent cases outside of the marital context? Most of these deal with marital dissolution and it's treated as a property settlement. That's correct. Are there any cases that you are aware of that you can share that involve unmarried partners? I am not aware of any cases that involve unmarried partners, but I will say that divorce is not the only contingency that these courts hang their hat on. And one example of that is the Dahl case out of Oregon. In that case, the contingency was that the parties would not be able to reach agreement on the disposition of the embryos, in which case they selected the wife to be the primary decision maker. The court held in that case that because they were given choices when they entered into the agreement, it could be enforceable. Again, here, there was simply no choice. Instead, the provision that Jacob seeks to enforce doesn't address separation at all. As we briefly discussed earlier, there are two portions of the informed consent that do address separation. The first one, because of the possibility of you and or your partner's separation, it is important for you to decide what should be done with any of your creopreserved embryos that remain in the laboratory in such an eventuality. And number two, in the event of dissolution of the partnership, Northwestern will abide by the terms of the court decree or settlement agreement regarding ownership and or other rights to the embryos. Those provisions specifically contemplate separation of the parties, urge the parties to visit outside counsel to reach their own agreement, which is exactly what the parties did. And that agreement, the co-parent agreement, was consistent with the oral agreement reached the day before. Moving on to the co-parent agreement, the parties testified that they met with Nidhi Desai at the express recommendation of Dr. Kayser, specifically for the purpose of creating a contract that set forth the parties' wishes with respect to the pre-embryos. Again, not Northwestern's wishes, but the parties' wishes. Ms. Desai, a neutral third-party witness, testified Jacob told her she should be able to use the pre-embryos if the parties were to split and that he wanted to help Dr. Dunson have children. She said, quote, the idea they both came in with was that he wanted to help her have these kids. Jacob testified that at this meeting with Ms. Desai, he didn't say that there were any possible circumstances that could arise in the future under which Carla would not be able to use the pre-embryos. Didn't he testify also at one point that he thought the co-parent agreement gave him equal rights to a child and therefore, by inference, equal rights to any pre-embryo? I believe what he testified was that his general understanding of co-parent agreements was that the parties would be in equal position. However, the co-parent agreement as drafted specifically included a provision. It's in the record at page 504 that says, quote, should the intended parties separate, Carla will control the disposition of the pre-embryos. He specifically – But he's talking about a document he never signed. It's correct. And she didn't sign it either? You're correct on both of those points. I mean, don't parties negotiate, give, take, talk, talk, and they both fully realize, I'm not bound until I sign on the dotted line? And don't courts universally accept that as a true expression of mutual consent by the parties, the fact that they execute the document? Well, Your Honor, the cases hold that even when not signed, agreements can be enforced either by acts in conduct or by silence, both of which we apply here. And just to give some context, it's true the parties did not sign the agreement. Now, both Dr. Kaser as well as Ms. Desai testified that it's actually quite common in a situation where a party is unexpectedly diagnosed with cancer and has imminent chemotherapy that the dispositional agreement may not be able to be executed prior to creation of the pre-embryo. So just to put it in context. Counsel, they didn't even discuss that agreement, though. Is that correct? They did not discuss the terms. Jacob did tell Carla he had been meaning to sign it. He also testified he received it on March 29th, specifically testified that he read the portion of the agreement that said Carla should control the disposition of the pre-embryos if the parties were to separate. And despite reading that, never told Carla or Ms. Desai he disagreed with that term or any other term of the agreement and went on, on April 6th, to knowingly fertilize the final eight eggs that Carla would ever create. Dr. Kaser told the parties that fewer eggs had been retrieved than anticipated. He said if you want to maximize your chances of having a child, you should fertilize all eight. Carla specifically asked Jacob what to do because she testified she needed him to be on board with this. This was her last chance to have a biological child, and Jacob said fertilize all eight. Can I ask you a question on going to the balancing of the interests, just so that we have a full record here? Counsel has made the argument that Carla's interests have been satisfied at this point. Because she has a non-biological child? We disagree with that. We think having a biological child is a unique, distinct interest. There will always be alternatives to achieving non-biological parenthood, and a finding that such alternatives impact a balancing test would result in a uniform finding against the party seeking to use the embryos. The Reber court rejected this argument. The husband argued that both adoption and foster parenting were available to the wife, and the court said, quote, our consideration is in the wife's interest to procreate as opposed to achieving any sort of parenthood. Here, the interest in biological parenthood is simply separate and distinct from other forms of parenthood. Carla's interests are compelling. It's impossible for her to have biological children without the use of pre-embryos. She testified the importance to them, and I think it's also worth pointing out, Carla doesn't seek to hold Jacob financially responsible for these children or impose any sort of legal obligation. She can't waive child support. Well, Judge, we think that the Illinois Parentage Act is on point. The site is 750-ILCS40-3. It says, the donor of semen to a licensed physician for use in artificial insemination of a woman other than the donor's wife shall be treated in law as if he were not the natural father of the child conceived. We think that's directly on point. Carla has repeatedly extended to Jacob the offer to have him declared a sperm donor under that act. That remains a live offer. Is that something that you are seeking a ruling on or asking for a declaratory judgment? Because that's not something that's part of the record. I believe we had asked for that in the lower court, and Judge Hall didn't specifically rule on that. Okay. But certainly we believe that it, by law, applies in this situation. Another compelling interest in Carla's favor is simply the knowledge and reliance here. Jacob knew when he agreed to create these embryos that Carla was in this position. Nonetheless, agreed to fertilize her final eight eggs, and Carla obviously relied on those promises. Now, Jacob's interests comparatively are weaker. They're generally either speculative or can be alleviated. If I could quickly go through them, I counted five in the record. Number one, he testified he lost a woman that he loves, Ashley Harris, but she testified that the pre-embryos had nothing to do with the breakup. That's on the record at page 301-302. Jacob testified that unidentified people might not think the same of him because they don't know how they will feel if he's not involved in the life of any children that are born. This is speculative, and it can be alleviated, because Carla doesn't seek to prohibit Jacob from being a legal father if that's what he chooses. She's simply not trying to compel him to do so. Third, Jacob testified he doesn't know if anyone will want to be with him. Again, this is speculative. Number four, Jacob testified he doesn't want to be forced against his will to be a father, but respectfully he voluntarily chose to donate sperm to Carla with his eyes wide open, knowing that Carla wanted to use these embryos for the express purpose of having a biological child. Finally, Jacob testified that he has some privacy concerns, but those are moot by the institution of the lawsuit, which Jacob himself did. Counselor, I have one quick question. At what point would he have had any revocable right in this? What if he had just donated his sperm and that was it, and the process had started and they hadn't been used to fertilize the pre-embryos yet? Could he rescind his participation at that point? Are there incremental points that he can rescind the contract? Well, I think he obviously could have rescinded the promise to donate sperm. You can't obviously force a person to donate sperm. It would violate their bodily integrity. What if it's been donated and it's sitting there, and it's between March 25th and April 6th, and he changed his mind? I suppose at that point he could have revoked. However, that's obviously not the situation that we're in. And the problem is that he didn't do that, and so now we can't undo his actions. The sperm no longer exists. It's fertilized the eggs. These are pre-embryos. They're the last pre-embryos. Carla cannot go back and use another donor. In that hypothetical, she could have used an anonymous donor. She could have simply frozen eggs and hoped to use a different donor down the line. But he took that away from her, specifically by agreeing to provide a sperm and specifically by telling her that he wanted her to have a biological child. If I could quickly... If Jacob was embarrassed by this, why did he file this lawsuit, do you think? It's a good question, Your Honor. The parties negotiated some sperm donor agreements. Jacob wrote Carla that he was willing to enter into an agreement that would give her the right to use the pre-embryos and that he wanted her to have them. That was on September 10th. The parties negotiated a number of sperm donor agreements. They weren't ultimately signed, apparently because they did not address Jacob's privacy concerns, and then he went and filed the lawsuit. I'm not really sure the reason why. And just quickly, Your Honors, I'd just like to briefly address Carla's promissory estoppel theory. This Court did not previously rule whether a promissory estoppel theory could be applied in a situation like this. We think this is a clear case of detrimental reliance. Again, Jacob... Was that briefed? It was briefed, Your Honor. It was briefed on both... Proceed. ...on both runs of the appeal. It just was not specifically ruled on in Sopransky 1. Again, Jacob repeatedly promised he wanted to help Carla have a child. The pinnacle event is April 6th, when he knows these are the last eggs Carla will ever produce, and he knowingly agrees to fertilize them, knowing when he does so that Carla will not be able to use another donor. Carla testified that she relied on this and that if she had ever known at any point, up to the fertilization of eggs, that Jacob had even a doubt in his mind that she would be able to use them, she would have taken some other measure to preserve her ability to have a biological child. She would have frozen eggs. She would have used an anonymous donor. So what Jacob... She could have had only one or two embryos done and left the others open. She could have split, exactly. But she relied on his promises. She testified she specifically asked if he was on board with fertilizing all eight because she had to know this was her only chance to have these children. She wanted to do everything she could to preserve it. He specifically said fertilize all eight, and we're in the situation that we are now. If Your Honors have no further questions, respectfully request that you affirm the ruling of Judge Hall. Thank you. Thank you. Mr. Schroeder. Yes, Your Honor. Justice Harris hit the nail on the head. There is nothing in the record that shows any agreement about the consent issue on March 24th. There is everything in the record that shows that on March 25th they agreed they both had to consent, again because Dr. Kaser told them that's what the document said. They sat there, heard him, and then signed it. So that issue, we like to think at least, is foreclosed. Justice Simon, you had asked about reconciling Jacob's testimony that he never considered consent with his other testimony that he did not want to use without his consent. I think the reconciliation is the first testimony was relating to, it was my question to him directly, about the conversation on March 24th. His later testimony was not relating to the March 24th events. I think it was more broadly about the case in general. And if you go to the record on page 896 and 897, Jacob says everything was in reference to the consent I had signed just a few hours before. That kind of ensured me at least that I would have to consent to their use. He also goes on to testify that he didn't feel it was his job to tell Carla what the document said because she was there and heard what it said. And both under her testimony and under Melina, you are presumed to have knowledge of and assent to the document you signed. She signed something on March 25th, not only signing it, but being told what it said, and then signed it. And that eliminates any possibility of there being an inconsistent agreement the day before. The counsel said in her discussion that on March 25th, Jacob said to Nidhi Desai, I wanted to help Carla have a child. I want to help her. I want to help her. Help is not the same as unfettered consent. And also, that was on March 25th. Under Bank of Ravenswood and other cases, you look at intent as of the date the contract was executed. That was what he said on March 25th. He didn't say on March 25th. What I meant yesterday was she could do this. So that testimony, again, was an improper basis for the circuit court's ruling. The consent counsel, Dr. Dunson, also asserts that the consent form is just a boilerplate, essentially meaningless document. It is more than that. And it's more than that, again, because it says they both must consent to any use of the embryos. And that was, again, specifically said to them. Dr. Kazer, if you look at his testimony on page 443 and 446 of the record, we tell couples if they're not married and they wish in the future to use the embryos for the purpose of initiating a pregnancy, that they both have to sign off on that before we'll provide them with the embryos. He then says it was highly likely that it pointed out that provision specifically in the case of this couple. They, again, knew what they were getting into. So while Jacob admittedly didn't tell her afterwards, anytime after March 25th, I reserve the right to do this or I reserve the right to do that, he didn't have to because they already knew that it was his right in the first place. He didn't have to keep saying, oh, by the way, I reserve my rights on March 27th or 28th or the 31st or the 30th. He didn't have to say, I still reserve those rights that I had under this agreement we signed. The draft co-parent agreement, Nidhi Desai's testimony is replete. It was a discussion point. No conclusive decision was made at the meeting. It was a direction I thought they were headed in, in terms of Carla having the sole right to control the use of the embryos. She said, quote, no conclusive decision was made at the meeting. It doesn't matter, therefore, what Jacob said. I mean, he may have said, I want her to have them, but Nidhi Desai and his circuit court found they didn't agree on anything when they met with Nidhi Desai. The co-parent agreement didn't even exist on March 25th. They could not possibly have agreed upon it. On March 29th, it was provided, yes, but Carla testified she never read it. How can she bind Jacob to something she didn't read? That does not make any sense under norms of contract, or at least those that I know. The co-parent agreement, counsel said in her discussion that the co-parent agreement represents, quote, the party's intent, whereas the informed consent represented Northwestern's intent. That, we submit, is incorrect because, again, it was said to them by Dr. Kayser, this is what it means. You both must consent. They sat there, heard it. Neither of them, the evidence shows, complained or objected and said, I don't like this. And then they signed it. They agreed it was their intent, not just Northwestern's intent, but theirs as well, an intent that they have never since changed. And that is why we believe that Jacob should prevail that his rights under the contract, as this Court set forth in Safranski 1, exist and have to be vindicated. And it's not, you know, we're not saying that Carla, she may never be used to the embryos, but she may. We don't know because, again, the future is uncertain. But right now, right here, the contract that they signed gives him the right to control how they're used, as it does with her. And that right has to be respected. We submit the circuit court erred in ruling that Carla had the sole right to decide how to use the embryos. Jacob should not be forced to become a parent against his will. They agreed that that was not something that would be foisted upon him. Respectfully, I mean, we're not heartless. We understand Carla's position. But Jacob has concerns here as well, and those need to be respected. And that's what we're asking you to do. So we would ask that you reverse the circuit court, rule that Jacob has the right to control the use of the embryos in conjunction with Carla, and in order to that effect. Thank you very much. Thank you. Thank you to both counsel for your very thoughtful and helpful presentations. This matter will be taken under advisement. The court stands adjourned. Thank you.